1     UNITED STATES DISTRICT COURT
2     CENTRAL DISTRICT OF ILLINOIS

3 UNITED STATES OF AMERICA, ) Docket No. 20-cr-20035
            )
4   Plaintiff,    )
 vs.         ) Peoria, Illinois
5          ) January 14, 2021
 DOUGLAS O. MYNATT,   ) 10:14 a.m.
6          )
   Defendant.    )
7 _____)

8
      RECORD OF PROCEEDINGS
9      SENTENCING HEARING
   BEFORE THE HONORABLE JAMES E. SHADID
10    UNITED STATES DISTRICT JUDGE

11
      THE APPEARANCES
12
     ELHAM M. PEIRSON, ESQ.
13    Assistant U.S. Attorney
      201 South Vine
14     Urbana, IL  61802
    On behalf of the Plaintiff
15

16   ELISABETH R. POLLOCK, ESQ.
    Assistant Federal Defender
17    300 W. Main Street
     Urbana, IL  61801
18   On behalf of the Defendant

19

20

21

22    Nancy Mersot, CSR, RPR
  United States District Court Reporter
23    100 N.E. Monroe Street
     Peoria, IL  61602
24
 Proceedings recorded by mechanical stenography,
25 transcript produced by computer-aided transcription.

```
 1              (In open court, 10:14 a.m.)
 2              THE COURT:  All right.  This is the United
 3   States v. Douglas Mynatt, present with Miss Pollock
 4   in 20-20035.
 5              Miss Peirson present for the government.
 6              This matter is set for sentencing today
 7   pursuant to a plea previously tendered to a
 8   four-count indictment wherein Mr. Mynatt -- am I
 9   pronouncing that correctly?
10              DEFENDANT MYNATT:  Yes.
11              THE COURT:  Okay.  Thank you.
12              -- pled guilty to all four counts; waived
13   his right to attack his sentence in any
14   post-conviction proceeding.
15              On October 16th an order of forfeiture was
16   granted.
17              On October 27, 2020, an order adopting the
18   report and recommendation by the magistrate, who
19   took the plea on October 9th, was accepted.
20              A Presentence Investigation Report was
21   ordered.  And it appears the parties have received
22   the same.  And if there were any objections, they
23   have been addressed and resolved; is that correct,
24   Miss Peirson?
25              MS. PEIRSON:  Yes, Your Honor.
```

 1          THE COURT:  Miss Pollock?

 2          MS. POLLOCK:  That's not correct from our

 3  side, Your Honor.  I'm not sure -- I think I

 4  probably emailed and said that we would just handle

 5  the use of the computer in a 3553(a) argument,

 6  although I do believe that I still need to preserve

 7  it as a guideline objection, have the Court rule on

 8  it, to affect the ultimate guideline range.

 9          THE COURT:  So your objection is that the

10  use of computer should not be assigned --

11          MS. POLLOCK:  That's correct, Your Honor.

12          THE COURT:  -- because it's almost -- it's

13  pretty much a -- go ahead, make your argument.

14          MS. POLLOCK:  Judge, it is really contained

15  within the sentencing commentary that I filed.  The

16  fact that both of the Departments of Justice has

17  basically conceded that this enhancement should not

18  apply because it does nothing to distinguish among

19  offenders, and a practice of district courts across

20  this district agreeing with that position, and the

21  objection by the defense, I don't know that there is

22  much of a dispute there that it should come off.

23          THE COURT:  Miss Peirson, any response?

24          MS. PEIRSON:  No, Your Honor.  I agree that

25  the use of computer, the Department's position is

1  that it does not assist this Court in determining a

2  more aggravated risk factor for defendants because

3  it is so widely applicable in most of these cases.

4      THE COURT:  Are you saying that it should be

5  removed or it should be a factor for the Court to

6  consider at the sentencing and not affect the

7  guideline range?

8      MS. PEIRSON:  Well, Your Honor, the position

9  of the Department of Justice, and the analysis that

10  they did with the guidelines is back in 2012, the

11  Sentencing Commission has not revised the guidelines

12  since then, even though they have had an opportunity

13  to do so.  So it is legally applicable.  But I think

14  that -- the courts vary on how they address it.  And

15  I have no objection to the Court finding that it is

16  not a valuable factor and calculating the range

17  without it, I think may be clearer.  But, however

18  this Court's normal practice is, is fine with me.

19      THE COURT:  Miss Pollock, anything else?

20      MS. POLLOCK:  Not with respect to

21  objections, Your Honor.

22      THE COURT:  I think my practice has been

23  generally to say that it applies because it hasn't

24  been addressed specifically as to from the

25  Sentencing Commission to remove it because there are

1 some circumstances where, even though I generally
2 believe it shouldn't be factored in, that it should.
3 So I've left it alone until further guidance from
4 the Sentencing Commission.
5         But in this case -- so I will overrule the
6 objection; allow the argument to be made and apply
7 the argument as a sentencing alternatives for all
8 intents and purpose resentencing Mr. Mynatt as if he
9 were a total offense level 35.
10        MS. POLLOCK:  Thank you, Your Honor.
11        THE COURT:  Okay.  So we made a record on
12 that.
13        So with that in mind then, are there any
14 other objections that need to be addressed?
15        MS. POLLOCK:  Not to the Presentence Report,
16 Your Honor.
17        THE COURT:  So we have a total offense level
18 37, Criminal History Category of I, which has a
19 guideline range of 210 to 262 months as to Counts 1
20 through 3.  As to Count 4, the maximum is 20 years,
21 so the guideline range becomes 210 to 240 months.
22        Having said that, I will be -- well, let me
23 go through it.
24        Supervised release period on Counts 1
25 through 4, five years to life.

 1          Ineligible for probation.

 2          $40,000 to $400,000 fine.

 3          Restitution not at issue.

 4          A special assessment of $100 on each count.

 5          Given my statement and record made, do the

 6    parties agree those are the guideline provisions?

 7          MS. PEIRSON:  Yes, Your Honor.

 8          MS. POLLOCK:  Yes, Your Honor.

 9          THE COURT:  Okay.  Now, having said that for

10    argument sake, it appears, at least in my mind, we

11    would be addressing a guideline range of 168 to 210

12    months.  Okay?

13          All right.  With that in mind, any formal

14    evidence to be presented from the government?

15          MS. PEIRSON:  Your Honor, I do have one

16    thing that I would like to read into the record.

17          MS. POLLOCK:  Which I object to.

18          THE COURT:  All right.  Well, let me find

19    out what it is first, Miss Pollock.

20          MS. PEIRSON:  Your Honor, this case is

21    somewhat interesting.  It's -- the defendant in this

22    case, as the Court knows from the PSR, works as the

23    gym teacher/track coach at University High School.

24          But, unfortunately, this is not the first

25    time that University High School has been impacted

by a child sex abuse scandal.

In 2007 the defendant's assistant, Yuri Ermakov, was convicted in absentia while -- I think while the jury was deliberating or at some point towards the end of trial.  He fled the country after there was evidence that he was having inappropriate sexual relationships with his students at University High School.

One of the victims from that case reached out to me.  She was -- when she had heard about the defendant's arrest, she was curious to track the case.  And had been, you know, asking me for updates on the progress throughout the pendency of this case.  She sent me an email, and I think that there are certain -- and she's given me permission to read it into the record.  I have given Miss Pollock a copy.  I indicated to her she is not a victim for the purposes of this case, so it is not really a victim impact statement.  But it does talk about her interactions with the defendant while she was a victim in that other case, and he was a mandatory reporter, and this suspect's supervisor, and he was actually present during the trial.

And she sent me this email as a different perspective from the defendant's sentencing

1   commentary which references his strong support in

2   the community based on his, his position at the

3   University High School.  So, that is what I'd like

4   to read to the Court.

5           THE COURT:  Miss Pollock?

6           MS. POLLOCK:  Your Honor, this is totally

7   irrelevant because this individual, whoever she is,

8   who we don't know who she is, is not a victim in

9   this case; has not interacted with the defendant in

10  almost a decade, maybe more than a decade; has no

11  bearing on this whatsoever.  It is irrelevant.

12          The people who get to make statements in

13  court are victims of crime and people who the

14  defendant calls in mitigation.  I don't know that

15  without -- you know, having been handed this this

16  morning, you know, the Court doesn't walk into the

17  high school where the defendant worked and start

18  asking people for their opinion about him.  It deals

19  with the evidence as presented, which is within the

20  structure of the court, which is if you are a

21  victim, you get to make a statement, and the

22  defendant gets to present his mitigation.  I don't

23  see that this fits into either category, nor has

24  this individual had anything to do with this case.

25  So I think it is irrelevant and the Court should not

 1  allow it.

 2          THE COURT:  Miss Peirson?

 3          MS. PEIRSON:  Your Honor, I think that the

 4  Court has wide discretion to consider any evidence

 5  it thinks would assist the Court in fashioning an

 6  appropriate sentence.  It doesn't necessarily have

 7  to be in the categories as narrowly defined as

 8  Miss Pollock suggests.  Any information that's

 9  helpful to the Court -- and the Court, unlike, you

10  know, a jury trial where we are dealing with lay

11  people who may be swayed one way or another, this

12  Court can, if it finds the information not to be

13  helpful, just put it aside and fashion a sentence

14  without regard to that.  But I found that what she

15  wrote to me was -- would be helpful for the Court,

16  in the government's opinion; and so, therefore, I'd

17  ask to be able to read the few sentences that she

18  wrote to me.  And if the Court doesn't find it

19  helpful, it can put it aside.

20          MS. POLLOCK:  Your Honor, if I might real

21  briefly.

22          I don't know if the Court is going to rule

23  in my favor, if you are I'll be quiet, but this

24  individual is talking about a period of time

25  interacting with Doug Mynatt in respect to a

1 different case. I have it -- I can't cross-examine
2 her and get her to admit that Doug was supportive;
3 that he fulfilled his duties as a mandated reporter
4 under the law of the State of Illinois during that
5 entire situation. I have no opportunity to elicit
6 any information which might dent what has been
7 written here. And I don't think that that is, due
8 process speaking, fair to Mr. Mynatt. So I maintain
9 my objection.

10 THE COURT: When was this -- when did this
11 person contact you, Miss Peirson?

12 MS. PEIRSON: Your Honor, she sent me the
13 email yesterday morning at 6:40 a.m. But I was
14 swamped yesterday trying to prepare for today, and I
15 didn't get a chance to really take a look at it
16 until late last night. So I printed it and gave a
17 copy to Miss Pollock this morning.

18 I've redacted her name just because she was
19 a victim in that prior case.

20 MS. POLLOCK: Not Mr. Mynatt's victim, just
21 to be clear.

22 MS. PEIRSON: No, no, she was not
23 Mr. Mynatt's victim, but she told me that it would
24 be okay with her if I disclosed her name in court.
25 I just wasn't comfortable doing that. If that makes

1 a difference to the Court, she was okay with her

2 name being disclosed.

3         THE COURT:  No.  But what I am more

4 concerned about is that if this contact just

5 occurred, just recently, that would be one thing; if

6 it occurred sometime ago, she could have been

7 forwarded to probation; probation could have

8 prepared it; a discussion of it in the Presentence

9 Report under 3553 factors or something; and then

10 Miss Pollock would have been put on some notice.

11 That's what -- that's what I am getting at.

12         So I don't know when the young lady -- I

13 assume young lady -- first contacted you.

14         MS. PEIRSON:  Well, she contacted me -- I

15 think that I can tell the Court -- I believe it was

16 last week, and she wanted to know when the

17 sentencing was and if she could speak.  And then I

18 indicated to her that because she is not a victim

19 for the count of conviction, that it would be

20 unlikely that the Court would accept a victim impact

21 statement.

22         After she read Miss Pollock's commentary,

23 she wrote to me again and that was the email that I

24 got on Wednesday morning and she's reacting to the

25 statements in the commentary about the large

1  community support behind the defendant and what her

2  perspective was that differs from that.

3          THE COURT:  Okay.  Anything else,

4  Miss Pollock?

5          MS. POLLOCK:  No, Your Honor.

6          THE COURT:  Okay.  I am reluctant, but I

7  think until I've actually viewed it, I don't know

8  how reluctant I should be.  It does -- the

9  government has asked.  The government has pointed

10  out the wide discretion the Court has to consider

11  evidence relevant to Mr. Mynatt in 3553 factors, and

12  it appears that there is some relevance to his

13  history and characteristics.

14          I am starting to get a flavor for what I

15  feel Miss Peirson is about to say.  So I'll allow it

16  in that limited regard.  And then I'll make a

17  determination on whether -- if it factors in the

18  sentencing or not, I'll make a record on that.  And

19  her name does not need to be revealed at this point.

20          So how do you want to do it?

21          MS. PEIRSON:  Your Honor, if I may, I can

22  read the paragraphs into the record that I thought

23  were relevant, or I can give the Court a copy of it.

24          THE COURT:  Miss Pollock --

25          MS. PEIRSON:  There are portions of it that

1  are irrelevant.

2          THE COURT:  Miss Pollock, do you want the

3  whole thing --

4          MS. POLLOCK:  I would prefer, if the Court

5  is going to look at it first, just give him the

6  email.

7          THE COURT:  Okay.  That's how we'll do it.

8          MS. PEIRSON:  If I may, Your Honor?

9          THE COURT:  You may.

10          (Brief pause while Court reads document.)

11          THE COURT:  All right.  Now anything else?

12  Otherwise, we'll get to arguments as to sentencing

13  alternatives.

14          MS. PEIRSON:  No further evidence, Your

15  Honor.  I wanted to just make sure, we submitted a

16  victim impact statement for this case from the

17  Violet series -- or the At School series; it's the

18  Violet victim, through probation, and I wanted to

19  make sure that the Court had a copy of that.

20          THE COURT:  I received that, yes.

21          MS. PEIRSON:  Nothing further.

22          THE COURT:  Okay.  Any formal evidence from

23  the defense?

24          MS. POLLOCK:  No, Your Honor.

25          THE COURT:  Argument.

1      MS. PEIRSON:  Your Honor, it's clear from
2 the letters that were filed on behalf of Mr. Mynatt
3 that he led two lives.  One as a teacher, as a
4 coach, as an apparently upstanding member of the
5 community, and the other person had an insatiable
6 appetite for child pornography.
7      As I noted in the prior case, I found it a
8 little perplexing that the letters of support were
9 filed under seal.  I don't think that that was --
10 those are routinely done so.  And as I mentioned, I
11 don't think that there's any legal authority to do
12 so.  Addresses and other sensitive information can
13 easily be redacted.  But I was concerned; that it's
14 easier to garner substantial support for a child sex
15 predator from prominent members of the community, if
16 they're assured that their names won't be made
17 public.
18      MS. POLLOCK:  Which didn't happen.
19      MS. PEIRSON:  So I am going to ask the Court
20 to either take those letters with a grain of salt or
21 consider making them public.
22      The local rules, as I noted, 49.9, indicates
23 that the Court does not approve of sealed documents,
24 and the only legal basis here was that there was
25 personal identifying information contained therein.

1  But the names of individuals are certainly not

2  sensitive material.

3        I bring this up, as I mentioned, because of

4  the prior incident.  And the victim in that case had

5  contacted me and she was concerned about the

6  individuals who had rallied around the defendant;

7  and so, I found her statement to be somewhat telling

8  because it concerns me that how far back the

9  defendant's interest in the sexual exploitation of

10  young women went.  And if he was apparently

11  supportive of these young women as they told their

12  stories, he sat in the back of the courtroom and

13  listened to them, described in detail those

14  incidents, was he triggered by that?  Was he

15  interested in that?  Was he secretly --

16        MS. POLLOCK:  Your Honor, I'm sorry.  I have

17  to object to this as completely irrelevant in terms

18  of sentencing.  That case was in 2006.  That

19  individual has nothing to do with this case

20  whatsoever.  And all of the evidence in the present

21  case indicates computer activity of Mr. Mynatt

22  dating back a couple of years only, not 15, 16, or

23  17 years.  This is not relevant.

24        THE COURT:  Well, I am going to let

25  Miss Peirson have her say, and then I'll make a

1  record on my findings.

2          MS. PEIRSON:  Your Honor, I think it's just
3  awfully coincidental that we have two individuals
4  who worked closely together, both as track coaches
5  for the same school, involved in sexual misconduct
6  in some capacity.  And it's not like Mr. Mynatt
7  wasn't engaging in inappropriate sexual behavior at
8  the school with the students.

9          So it's through the trust that he's garnered
10 from all of these members of the community that he's
11 able to have access to minors.  And he is able to
12 abuse that trust by exploiting his own students.
13 And in that way, that creates an aggravator in the
14 government's mind.

15         So in this case, as noted in the PSR, we
16 have all of the child pornography videos that he
17 traded with like-minded individuals on groups, in
18 these private groups on Kik Messenger, and all of
19 the videos and the hundred thousand images that he
20 collected on his devices.

21         But there's another aggravator here, the
22 defendant took photos of his own students, albeit
23 their clothed genital area, and disseminated those
24 pictures to other pedophiles in these same child
25 pornography forums.  He did so on the school campus

1  where he traded the child pornography.

2       We found the IP addresses led back to the
3  University of Illinois, and he masturbated to the
4  child pornography images while in the school.  That
5  breach of trust makes this case more aggravated in
6  the government's mind.  This isn't just a
7  run-of-the-mill child pornography distribution case.
8  This is a teacher, a coach, an individual in a
9  trusted capacity who is not only trading child
10  pornography, things that are clearly child
11  pornography, but he is creating child erratica
12  images of his students and trading them in the same
13  forum; exploiting children who didn't realize that
14  they were being exploited.

15       As the victim noted in the At School series,
16  I found that victim impact statement to be pretty
17  articulate.  The sex abuse act itself, she says on
18  page 3, is one aspect to heal from, but it's more
19  challenging to -- it is the more challenging aspect
20  in the simple fact that her abuse is forever online.
21  She describes the child pornography images of her
22  daughter as being a life sentence.  She will forever
23  have the stigma and branding of being someone's
24  sexual object of pleasure.

25       She is always -- this is on page two -- be a

victim each time another monster, quote, enjoys her

images.  I also found it somewhat ironic that she

indicated that her child wanted to become a school

teacher in this case.

So, I think that this is just not your

typical case.  And I am going to ask the Court to

sentence him accordingly.

With that said, the defendant was

cooperative with the government and the government

does have a motion in this case.  I don't know how

the Court handles those downward departure motions,

if I should make that now or if there's any other

procedure that the Court wants to follow.

THE COURT:  You can do that.  Actually at

this time, I think would make sense to do so.

MS. POLLOCK:  That's fine, Your Honor.

THE COURT:  And whether you want to do it in

open court or do you want to go in chambers, is up

to you.

MS. POLLOCK:  Your Honor, generally speaking

in cases where there's going to be a 5K motion, my

request would be to do it off the record in

chambers, however, given the nature and

circumstances of this case, and the fact that I

don't believe that there is a risk to Mr. Mynatt

 1  from disclosing this information, I have no
 2  objection to doing it on the record.
 3          THE COURT:  Very good.  Then you could make
 4  it as part of or incorporate it as part of your
 5  argument, Miss Peirson.
 6          MS. PEIRSON:  Your Honor, the defendant
 7  provided valuable intelligence information regarding
 8  the nature of his offense, the websites he searched,
 9  the searched terms he used, his computer
10  proficiency, the applications he used to locate
11  child pornography.  He agreed to allow law
12  enforcement to take over his online identity and to
13  chat with and identify other child pornography
14  traders on the large platform called MEGA.nz.
15          He also explained his psychopathy, his
16  arousal patterns, and all of that helped assist the
17  agents to understand his behavior and the behavior
18  of other like-minded individuals.
19          He could not provide enough information to
20  be actionable against another specific target, but
21  he did give the agents intelligence information that
22  assisted ongoing investigations.
23          The agents found that the defendant was
24  cooperative and forthcoming.  He was neither
25  minimizing of his own conduct nor exaggerating

1  others.  The intelligent information that he
2  provided substantially assisted law enforcement, but
3  did not directly impact the prosecution of another
4  person.  And, therefore, I'm recommending a ten
5  percent downward departure from the low end of the
6  guidelines range.  And I am asking the Court to take
7  that ten percent from the range that the Court has
8  determined is more appropriate.  So ten percent from
9  168, which results in a recommended sentence by the
10 government of 151 months.
11        I am asking the Court also to impose 15
12 years of supervised release, and a $400 special
13 assessment.
14        THE COURT:  Thank you.
15        Miss Pollock.
16        MS. POLLOCK:  Thank you, Your Honor.
17        It's not very often that I want to strangle
18 Miss Peirson and hug her at the same time, but it
19 seems that she has accomplished that today.
20        Let's start with the hugging.  Thank you to
21 the government for the opportunity for Mr. Mynatt to
22 receive a ten percent cooperation departure.  As the
23 Court will note from reviewing the Presentence
24 Report in this case, Mr. Mynatt cooperated
25 immediately upon being discovered.  Agents showed up

1 at his house and he sat down with them for multiple
2 hours to give literally everything about himself and
3 his activities that he could possibly provide, which
4 resulted in the cooperation departure.  He admitted
5 all of his conduct and even admitted conduct which
6 is not criminal, but that is upsetting, such as
7 having an extra marital affair with somebody when
8 they were over the age of 18.

9       So he was more than forthcoming with his
10 information.  And gave all of the passwords to all
11 of his devices, not requiring the government to
12 obtain a search warrant or do any additional work to
13 receive that information.  So thank you to the
14 government for that.

15       Now to the strangulation.  The Yuri Ermakov
16 case was my case.  I litigated that case in 2006 and
17 2007.  And I will ask the Court to take judicial
18 notice of the facts that I am about to say.

19       Yuri Ermakov was a 24-year-old grad student
20 who was hired as an assistant coach to the U of I
21 High track and field program.  He inappropriately
22 provided alcohol and marijuana to juniors and
23 seniors at the high school when they would have
24 house parties at his apartment, a convenient escape
25 for them to be able to engage in activities that

1 their parents may not approve of.

2       During the course of these parties, Yuri

3 Ermakov developed a dating relationship with a

4 16-year-old female student and ended up laying in a

5 bed with her and making out.  As a result of that,

6 he was charged with one count of criminal sexual

7 assault for digital penetration of the 16 year old,

8 three counts of criminal sexual abuse for holding

9 onto her buttocks during the make-out session, and

10 three counts of corruption of a minor providing

11 alcohol and drugs to minors, all misdemeanors.

12       I litigated that trial with my co-counsel

13 Carol Dyson, who has since passed away.  And while

14 the jury was deliberating, Mr. Ermakov jumped on a

15 plane and flew to Russia where he remained for a

16 decade until he voluntarily returned to serve his

17 14-year sentence in the Illinois Department of

18 Corrections.

19       During that time, Doug Mynatt was his

20 supervisor.  He was a mandated reporter, which he

21 complied with.  He was there in a supportive

22 capacity for all of the students who were disturbed

23 by what happened and also for the individuals who

24 were victimized by Mr. Ermakov.

25       As I stated in my objection, there is zero

 1  evidence that Doug Mynatt ever perpetrated any

 2  criminal offense predating 2016 and 2017.  He was

 3  not involved in the Yuri Ermakov decision to engage

 4  in a dating relationship with a teenager.  Nor did

 5  he commit any acts involving the downloading,

 6  distributing, or receiving of child pornography

 7  until several years ago when he became addicted to

 8  adult pornography.  So that is my argument as to

 9  why, whatever happened with Yuri Ermakov in 2006 and

10  2007, is utterly irrelevant to what's going on

11  today.

12          Second --

13          THE COURT:  The Court -- having said all

14  that, the Court is not going to consider the letter

15  from the young lady, but I do understand why

16  Miss Peirson would present it.  And I do think there

17  is some relevance in the sense that it would be easy

18  to understand if you're this young lady, that she

19  might think that Mr. Mynatt was somehow approving of

20  the conduct of Mr. Ermakov given his supervisory

21  role and now given these types of charges.  But

22  having said that, I don't think that the connection

23  is such that any weight as to imposing a sentence

24  based on this is appropriate.

25          MS. POLLOCK:  Thank you, Judge.

1          THE COURT:  Go ahead.

2          MS. POLLOCK:  With respect to the 3553(a)

3   factors in this case, the nature and circumstances

4   of the offense are typical.  They involve the

5   downloading and communication on Kik Messenger.  The

6   statistics I cited in my sentencing commentary

7   indicate that they are fundamentally enhancements

8   for every single thing Mr.  Mynatt has done, which

9   are mostly applied in all other child pornography

10  cases as well.

11          So, the guidelines do not differentiate, not

12  only with regard to the use of the computer, which

13  is the one enhancement the DOJ had decided that they

14  don't wish to apply anymore, but also with regards

15  to the several other enhancements.  And the fact of

16  the matter is, is that when you look at the nature

17  and circumstances of the offense, it happened

18  because, as with many things, people have mental

19  illnesses, including addiction.  In Mr. Mynatt's

20  case, it started as an addiction to adult

21  pornography, and wharfed drastically over time into

22  what the Court sees before it today.

23          There are zero allegations that Mr. Mynatt

24  ever touched a child, harmed a child, was sexually

25  interested in a student, or anything else prior to

this offense.  He -- in fact, when the students that
there were pictures taken of them in their PE
clothes, when they were interviewed, they had said
he conducted himself in a perfectly acceptable way,
totally appropriate, never approached them, never
committed any act of exploitation or enticement or
actual hands on with regards to the school.  So that
just never happened.  And I think that that's key,
because as I point out in my sentencing commentary,
the concern with pornography offenses is the risk
that somebody that shows an interest in this kind of
material is going to hurt a child, is going to
actually commit a hands-on sex offense.  And that is
not to discount the harm that was done to the
victims of child pornography when they were filmed
and the redistribution affect it has, because, of
course, that has a victim impact.

However, in terms of recidivism, in terms of
what is an appropriate sentence, the Court has to be
concerned with whether or not Mr. Mynatt personally
is going to go out and commit a hands-on sex
offense.  And the evidence is clear that he is not.

With the appropriate therapies, which has
been also cited in my commentary, proven effective
with people who have been convicted of possession

1  and distribution child pornography crimes but not

2  hands-on offenses, the recidivism rate is incredibly

3  low.  And Mr. Mynatt, up until the age of almost 60,

4  has committed no other offenses and in particular

5  not even a traffic ticket for this guy.  Zero.  Zero

6  violations of the law throughout his entire history.

7       And I do want to make it clear for the

8  record that when my office solicits letters of

9  support from people, we inform them in the letter

10  that the letter will be filed with the Court, and we

11  tell them to direct it to the judge before whom we

12  are appearing.  The Court will note that in all of

13  these cases today and tomorrow, the letters are

14  directed to Judge Mihm, because that's who we

15  thought we were going to be appearing in front of,

16  so that's why they're addressed that way.

17       But there was never any indication or

18  request by any of these individuals to somehow keep

19  them out of the public eye.  In fact, they were told

20  they would be in the public eye.  So the reason they

21  were filed under seal is because when you have 45

22  pages of letters of support, going through each one

23  and individually redacting phone numbers and email

24  addresses and everything else that is personally

25  identifying that can't be filed of record, is a

1  pain.  So I appreciate the Court's willingness to
2  ask the clerk's office to assist me in that regard.
3  We have no objection to the redaction of personal
4  identifying information and the remainder of the
5  letters are public record.
6      In sum, Your Honor, Doug Mynatt destroyed
7  his life.  Destroyed his family's life.  Destroyed
8  his standing in the community.  And the question to
9  be asked is -- because we -- you know, why did it
10  happen, and how do we stop it?
11      Why it happened is because sometimes people
12  get addicted to things that they shouldn't get
13  addicted to.  If Mr. Mynatt had chosen drugs or
14  alcohol instead of pornography, if that's the
15  direction his brain took him in, we would be in a
16  different situation.  But it did not.
17      With respect to, is it going to happen
18  again, can we can stop it?  The answer is yes, we
19  can stop it, because he is not a hands-on offender.
20  He will have the benefit of the term of supervised
21  release and the services recommended by probation.
22  We have no objection to the imposition of the 15
23  years, as stated by the government.
24      So, Judge, based on everything else that was
25  filed of record, I won't belabor the issues that

```
 1  2G2.2 that I put into my commentary, but the Court
 2  is aware that a lot of these enhancements were
 3  basically just thrown at the wall by Congress
 4  without empirical research and puts the majority of
 5  offenders close to or near the statutory maximum,
 6  which in this case, until the Court dumped the use
 7  of the computer, which is exactly what happened.  So
 8  there is simply no reason why Doug Mynatt needs to
 9  spend 12 years in prison.  It's not going to fix
10  him.  It's not going to help the community.  What he
11  needs is a sentence that reflects the seriousness of
12  the conduct but gives the public the guarantee that
13  they will be protected in the future and gives
14  Mr. Mynatt the opportunity to fix himself, and
15  that's why we've requested the sentence that we've
16  requested.  Thank you, Your Honor.
17          THE COURT:  Thank you, Miss Pollock.
18          Mr. Mynatt, you have an opportunity to make
19  a statement at this time, if you wish.
20          DEFENDANT MYNATT:  Thank you.
21          I shouldn't be here today.  I know better
22  than this.  My family and friends are better than
23  this.  But here I am.  Here we are because of my
24  actions.
25          On April 2nd, I was where I should have
```

been, at home; my son, Knox, chalk drawing on the driveway; and my wife, Susan, inside working from home during the first few weeks of COVID-19.

I was where I should have been the next morning, too.  Sitting next to Knox, looking forward to a morning of basketball with him.  Then at 7:45 a.m., everything changed.  With Knox by my side as always, running to the door with me, when the sheriff's deputies pounded on our door then pulled me outside.  That was the last time I've seen or spoken to Knox since, all because of my actions; my choices led me to this here in front of you here today.

In the short span of the next few months, I missed Mother's Day, Father's Day, my son's 14th birthday, my 18th wedding anniversary, and more.  We never celebrated big, but we were always there with each other and for each other.

Now in the last -- now in the last nine months, I haven't been there for my family at all, for anything at all, all because of my irresponsible choices and criminal actions.  I chose instead to take advantage of a child's misery and pain, a child's trust they had in an adult only to create confusion, distrust, and grief with my own family,

 1  my own community, my own life.  I am certain I've
 2  caused my son to experience true sadness for the
 3  first time in his life.  I've caused my wife to
 4  question our entire 22-year relationship.  I cry for
 5  them every single day and night since my arrest.
 6  I've experienced grief like I've never experienced
 7  before.  But as much as I've been affected, the
 8  victims of the abuses that I viewed, victims of
 9  exploitation and online trafficking have been
10  affected even more dramatically and suffered much
11  more fates.  I can't imagine how scared or confused
12  they felt or how hurt they were at the hands of an
13  adult that they trusted.  I regret not showing the
14  empathy I should had for these victims.  I can't
15  imagine how I'd feel if this had happened to my own
16  child.
17        My inappropriate actions also greatly
18  affected the entire U of I community, and a coaching
19  community that I've been a part of for 25 years:
20  breaching the trust and respect I've built up over
21  my entire career as a teacher and coach.
22        Although I'm not proud of who I am or where
23  I am right now, or how my actions perpetuated a
24  cycle of abuse and exploitation of minors, or how my
25  actions dishonored my school and my teams, or how

deeply and emotionally I have affected my own wife
and son.  A part of me is experiencing relief that
my arrest brought these regrettable actions to a
halt; actions that I wasn't able to bring to a halt
myself.

I learn lessons well, but this will
certainly be the hardest lesson ever learned.  I am
grateful that someone saw a part of me was broken
and needed to be stopped.  And I am confident the
next part of my life will help put an end to the
behaviors of my past.  I am open to any programs
that might be made available to treat this
addiction.

My sentencing will mark a new beginning in
my life.  I may have hit my rock bottom, but there
still is a good foundation there to build on.  I am
sorry that I supported a cycle of behavior that
feeds off the misfortune of minors.  I'm sorry I
brought dishonor to the entire U of I High
community.  I'm sorry I've hurt my own son so deeply
that he feels that he can't -- he can't talk to me
just yet.  And I can only hope the damage to our
relationship isn't beyond repair.  I'm sorry I've
caused my wife of 18 years to file for divorce, and
can't imagine the shock, the anger from, and the

1  grief that she's experienced from a situation she

2  did not sign up for, and I hope this doesn't close a

3  door on our relationship that can't be reopened.

4       I will diligently continue to write Knox, to

5  call and write to Susan as long as it takes -- as

6  long as it takes me to make amends for my actions,

7  as long as they'll let me.  I let this get the best

8  of me.  I let this separate me from the two people I

9  love the most.  I know where I should be, and that's

10 with Susan and Knox, and I messed that up for now.

11 I know better than this.  I shouldn't be here today,

12 and I am so sorry for it.

13      THE COURT:  Okay.  Thank you.

14      Miss Peirson, or both of you actually, I

15 assume that if there was any reason to connect or

16 dispute the statement about the acts with the former

17 students that became adults, that would have been

18 brought up in aggravation?

19      MS. PEIRSON:  Yes, Your Honor.

20      THE COURT:  Okay.  And is there any reason

21 to think that, as Miss Pollock points out, is there

22 any reason to think otherwise that Mr. Mynatt acted

23 on whatever desires he might have had beyond the

24 viewing and distribution?

25      MS. PEIRSON:  Your Honor, we have no

1 evidence that shows that the defendant engaged in

2 any sexual misconduct with a minor, any contact

3 offenses with a minor, so there is no evidence to

4 support that.

5        THE COURT:  With that in mind, the Court

6 having considered the Presentence Report, Sentencing

7 Guidelines calculations, the commentaries filed, the

8 arguments of counsel, the statement of Mr. Mynatt,

9 the factors in 3553:  Some cases present little

10 difficulty in deciding what an appropriate sentence

11 would be, and others provide a lot more difficulty I

12 guess, that's why we consider the 3553 factors for

13 guidance.

14        Teachers and coaches in our schools can be

15 one of two things.  I guess they can be role models.

16 They can be mentors.  They can be people that set

17 good examples, and people that provide good examples

18 and help young people get on the right track, stay

19 on the right track and live long and healthy lives.

20 Or they can be part of traumatizing young people in

21 many different ways, I guess.  And in some regard,

22 Mr. Mynatt, in this case, you were both.

23       According to all of these letters in support

24 on your behalf, which are nearly one-inch thick in

25 their entirety, you were a role model, a mentor for

 1   a number of young people, for lots of young people,

 2   both male and female.  And I made a point to go

 3   through these to look through to see if all of these

 4   came from parents of young males or just young males

 5   that were just former students of yours, but they

 6   are both, males and females that support you, and

 7   people in your community.

 8        On the other hand, the snapping, the taking

 9   of pictures of your female student athletes and the

10   minors while clothed, but sharing them to support of

11   the perverted desires of child pornographers and

12   others all around, that amounts to you coming all

13   around the world, would be traumatizing as well as

14   the distribution and the viewing and the sharing of

15   all of these images separately as photos.  Again,

16   these are real life children that are -- many are

17   now adults -- but they have been sentenced to a

18   lifetime of knowing that they are being viewed and

19   manipulated still to satisfy, again, the perverted

20   desires of adults manipulating them each and every

21   day.

22        So to come to a sentence that is appropriate

23   and sufficient, but not greater than necessary to

24   comply with the purpose of the Act requires me to

25   consider the fact that you have actually thrown your

```
 1  life away already.  All of the things that you
 2  worked for.  All of these people that you -- that
 3  wrote letters on your behalf, have clearly expressed
 4  shock, amazement, disappointment.  They still were,
 5  I believe, truthful in their statements about what
 6  you were for them, but they have to be disappointed
 7  in what you also are.  I do believe you're
 8  remorseful.
 9          I do think that you should receive plenty of
10  consideration for your assistance to law
11  enforcement.  Even if it didn't result in any other
12  arrests or things like that, to provide assistance
13  and intelligence, to assist law enforcement in
14  combating and shutting down and working towards
15  locating others that are simply exploiting minors
16  for their own desires, should give you plenty --
17  should be considered under your history and
18  characteristics.
19          So, under all of the 3553 factors, I believe
20  a sentence of 120 months to the Bureau of Prisons on
21  each of Counts 1, 2, 3, and 4 to run concurrent with
22  each other is sufficient but not greater than
23  necessary to comply with the purpose of the Act.
24          It will be followed by a term of 15 years of
25  supervised release.
```

 1          I will find no ability to pay a fine, so no

 2  fine is imposed.

 3          While on supervised release, not commit

 4  another federal, state, or local crime.

 5          Not possess a controlled substance.

 6          I will find that there is no likelihood of

 7  substance abuse and waive mandatory drug testing.

 8          You will cooperate in the collection of DNA

 9  as directed by probation or the Bureau of Prisons.

10          Comply with the requirements of the Sex

11  Offender Registration and Notification Act as

12  directed by probation, the Bureau of Prisons, or any

13  state sex offender registration agency in which you

14  reside, work, are a student, that you were convicted

15  of a qualifying offense.

16          In addition, I intend to impose the

17  conditions as set forth in paragraphs 76 through 85

18  in the Presentence Report.

19          Miss Pollock, have you gone over these with

20  Mr. Mynatt?

21          MS. POLLOCK:  I have, Your Honor.  We have

22  no objection and do not request reading on the

23  record.

24          THE COURT:  Mr. Mynatt, have you gone over

25  these with Miss Pollock, the proposed conditions of

1  supervised release?

2        DEFENDANT MYNATT:  Yes.

3        THE COURT:  Do you believe any further

4  reading or explanation is necessary?

5        DEFENDANT MYNATT:  No, sir.

6        THE COURT:  Do you believe that you

7  understand what's expected of you?

8        DEFENDANT MYNATT:  Yes, sir.

9        THE COURT:  All right.  I have read and

10  carefully considered each of the proposed

11  conditions.  I find that they are proper and

12  appropriate and a necessary part of the sentence and

13  will maximize the possibility that you will

14  successfully complete your term of supervised

15  release; therefore, I order the conditions to be

16  made part of the formal sentence.

17        A special assessment of $100 on each count

18  is imposed payable immediately.

19        I will recommend you serve your sentence in

20  a facility that will allow you to participate in sex

21  offender drug treatment or sex offender treatment.

22        Miss Pollock, any other recommendation being

23  requested?

24        MS. POLLOCK:  No.  The recommendation is

25  simply as close to Champaign as possible, please.

1    THE COURT:  And as close to Champaign as
2 possible.
3    You will forfeit all property as outlined in
4 the indictment.
5    Is there anything else the parties believe
6 needs to be addressed before appeal rights?
7    MS. POLLOCK:  No, Your Honor.
8    MS. PEIRSON:  Not from the government, Your
9 Honor.
10    THE COURT:  You waived appeal rights as part
11 of your plea.  If you believe you have appeal
12 rights, you have 14 days to do so or ask
13 Miss Pollock to do so on your behalf.
14    Thank you.
15    MS. PEIRSON:  Thank you.
16    (Hearing concludes, 11:02 a.m.)
17                    *****
18
19    I certify that the foregoing is a correct
20 transcript from the record of proceedings in the
21 above-entitled matter.
22
23 s/Nancy Mersot        Date:  April 26, 2022
24 Court Reporter
25